May it please the court. I'm Jerry Gansfried. I represent the plaintiff appellants in this case, and I'd like to reserve four minutes for rebuttal. Four minutes out of ten or out of twenty? Well, I'll take it out of twenty, but if I use it out of ten, I'd be happy to use the time for the rest of the day. This case arises from a chaotic situation that the government created by igniting a massive amount of fire in Montana's Bitterroot Valley. The fires that the government set in violation of safety policies that it concedes are mandatory. It damaged, and it did so in violation of safety policies that, well, as I said, that it concedes are mandatory. It damaged scores of buildings, and it damaged the property of more than 100 residents. Now, on the government's motion for summary judgment, the district court dismissed all claims under the discretionary function exception to the FTCA. And in doing so, the district court effectively created a generalized firefighting exception to the FTCA, an immunity for firefighting, which is precisely the contention that the Supreme Court rejected in the Rainier case. Now, in explaining why the decision below should be reversed, I'd like to focus on the following points. One, that there is not and should not be a firefighting exception to the FTCA. Well, we've already recognized one in a number of situations, right? The Miller case? Not a generalized firefighting situation. You said there shouldn't be a firefighting exception. We've already recognized a firefighting exception. So you can't make a blanket statement like that. Well, the blanket statement I want to make is that anything connected with firefighting does not automatically put it within the discretionary function exception. That's a different proposition.  And as the Court said, there were no rules, regulations, policies, directives governing the multiple-fire situation. And so in that context, it fit within the exception. But the way the district court has addressed this and the way the government argues the case, they would effectively create a firefighting exception. And one way of assessing this and measuring this is that the contention is and the evidence is that there were at least six backfires set by the government. The government denies three of them. But it says even as to those three, there's immunity under the discretionary function exception because if they did it, it would have been immune. Now, what discretion, what policy determination can be made in the course of actions that you claim that you didn't have, you didn't make? And the only explanation for that is that the government is advocating a generalized firefighting exception. You know, in the district court, and the district court asked the government's counsel, well, in terms of the immunity that you're claiming, can you give me a firefighting example that would not be subject to the discretionary function exception? And the only thing that the government could come up with was a situation in which there was somebody who was employed as a firefighter who went out and burned old love letters, and it started a fire. Now, to me, that's not even firefighting. That's starting a fire. That was the only example that the government could provide as to where the line would be drawn. And, see, that makes it abundantly clear, certainly, that what the government is talking about is a blanket firefighting exemption from the Federal Tort Claims Act, and that doesn't exist. Supreme Court has found that there are contexts in which firefighting and decisions by firefighters and actions by firefighters are subject to suit. Well, maybe you could tell us what, I mean, firefighting is, I put it bluntly, a volatile science these days, and, of course, you know, the smoking air policy is out, and they've got all kinds of other policies now. So what is the non-discretionary conduct here that meets the first problem? Well, here we have a collection of policies, directives, and rules. We have number one, well, just take a look, the ten firefighting orders, ten standard firefighting orders, the 18 watch-out situations, which are also known as the survival checklist. We have the WFSA, the wildland fire situations analysis, and we have the IAP for the particular events that we're talking about here. Now, let me just use some basic administrative law discussion to trace through some of this. The delegation of authority to the incident commanders in both the Sula Complex and the Valley Complex, Mr. Stamm and Mr. Fry, those delegations, Mr. Fry is at page 1351 of the executive record for Mr. Stamm, that's at 1474, 1475, those expressly say that the incident commanders, who are levels above the people who engage in the actions that we're talking about here, that the incident commanders must follow the WFSA, must. Now, if we look to the WFSA, in my particular reference, it may not be the first page, but at page 1477 of the executive record, one of the specific requirements there is communications must be maintained with adjacent incidents. And at least one of the incidents that's involved in creating the chaos that we have here involved Mr. Whitmer and his group and Mr. Vizdak and his group who were engaged in firing operations, neither one knowing about the other. In the testimony of Mr. Mononi, who was working with Mr. Whitmer, and talking about how close they came to trapping the other people, they simply didn't know that they were there. There had not been clearances. There had not been communication on that. That's one aspect of it. Let me refer also to another page in the WFSA. What does it have to do with whether or not this comes under the discretionary function? I'm not following you. Because one of the decisions, one of the actions that Mr. Whitmer and Mr. Vizdak and a number of other people did was they did not communicate with the people with whom they were required to communicate. It put them and everyone around them at risk. Which means they did their job badly. But what does that have to do with, you know, whether or not? It means they violated specific directives that had to govern their conduct. The WFSA also says that if the tactical hazards cannot be mitigated, don't implement. That couldn't be more direct. It couldn't be more specific. That is in the WFSA, which is expressly incorporated in the delegation of authority. They didn't mitigate. They were in situations where under these express provisions, and this is in the WFSA discussing the application of the ten standard fire orders. It says don't implement. What the government is claiming in this case is that Mr. Whitmer had the discretion to decide he was going to implement something, and what he implemented was exactly what the written delegations and instructions from the ten standard fire orders on down to his particular incident said do not implement. Our convention is that and as well as many other things that he and others did in this context were not matters as to which they had discretion. They were mandatory instructions, which the government concedes that they're mandatory. But then you'd have to go to the second prong. Correct? Yes. They were not making policy decisions. The policy decisions to implement. Well, I don't think I have to get to the second prong because I went on the first prong. The government has to establish both. And if there was no discretion to do what Mr. Whitmer and the division supervisors did, then you have to reverse. I can address the second prong certainly, but it flows from the first. There was no discretion to do this. There was no policy. The only policy decision that was made were the policy decisions being made by the people further up the chain of command who made the policy decisions that the people on the lines could not do the things that they did. Now, I mentioned communications. That is one of the problems. I mentioned some other things. For example, the day before this blowup, which was on August 6th of 2000, the prior day, August 5th. The more specific question we have to figure out is that in the Miller case, Kelly, and these other cases, they basically say you've got the big umbrella policy, the four-service manual, and then you keep going down to the little subsidiary rules, regulations, and directives. And that some of those do have mandatory language, but that they don't really give you the kind of cookbook that you need on how to fight a fire, and therefore it falls under discretionary function exception. So it seems to me that your challenge is to show us why this case is different or why your mandatory language can't be characterized like mandatory language in these other cases. Well, one thing that is important for our case is that ours is not only mandatory, but when you look at the additional instructions that are added, they're also specific. They are specific to this incident. When you say instructions, you're talking about instructions from the supervisors? Instructions. Or instructions in a written manual. No. In the WFSA, I'm talking about instructions from the supervisors. And the supervisors, pursuant to the delegations of authority to them, they are required to adhere to the WFSA. And when the WFSA says you must do this and you cannot do that, that's binding. That's mandatory and specific. And it's not something that was written 10 years earlier elsewhere without this matter in mind. It's not written in general language. It's specific to this. Now, I think also ---- Well, let me give you an example of these, the one where you have the list and then it makes the acronym so you can remember. The standard fire words, yes. The standard fire words, yes. Right. So one of them, you're supposed to fight a fire aggressively, but you have to make sure you have safety. Right? Right. In your view, is that a mandatory directive that would remove it from the discretionary function? Well, we and the government all agree that that's mandatory. Right. But is it specific enough? I mean, does it tell you what you need to do? It does in this situation for a number of reasons. One, because there are some additional written directives that are mandatory and specific, but also because what we were dealing with here was decisions and actions that put people at risk in order to try to preserve property. Are you talking about the document entitled Fire Orders in ER 1383? Is that what we're talking about, fire orders? Well, the copy that I have is at 1383, but it appears in a number of places in the excerpt. The one with Judge McCain's head with the acronym? Yes. Okay. And, for instance, stay alert, keep calm, think clearly, act decisively. And so if somebody doesn't think clearly, there's a violation there that's a. . . Well, there could be. A violation that's non-discretionary? There could be. Look, we agree that there are certain situations that arise in the course of fighting a fire, as in the course of many other activities, where decisions have to be made, judgments have to be made, and they're not necessarily decisions to be second-guessed. Well, let me say that a second. They're not to be second-guessed for policy, but sometimes these decisions that are made are not policy decisions. And a decision, there's simply decisions, and the only second-guessing that this exception is supposed to preclude is second-guessing of policy determinations. There are lots of rules that may be general, but you don't have to make them so specific to the point of minutia in order to get the point across. A crossing guard will have some discretion in the flow of traffic. A crossing guard cannot send cars into an intersection when there are children crossing. Do you need to have a rule that says don't do that? Otherwise, it's discretion. If a road crew demolishes a bridge without checking to see that there are cars crossing before the point of time of demolition, you don't necessarily need a rule that says, by the way, check to make sure there are no cars on the bridge. A general safety instruction ought to be enough, and it ought to be clear that anyone doing that kind of thing is doing something in an area in which he or she does not have discretion. That's the kind of activity that we had in this case. I guess I'm still having trouble finding out exactly what discretion was circumscribed by the specific rule. Because these, you know, fire aggressively, and then you have another one. Be nice to your employees. Let me say something else that I think is very important to exactly this point. The ten standard fire orders that we're looking at and the watch out situations, which are on the following page, are exactly the standards that OSHA uses in seeking sanctions and imposing discipline on the Forest Service. And in our briefing in the excerpt of record, we have examples of three of them. And these are the standards. They are not only mandatory, they are specific enough for the government to use them as the basis for disciplinary action. So I agree. We may look and say, well, some language seems kind of general. You don't use your discretion wisely. I mean, the government expects people who have discretion to use it well and to use it wisely and to follow certain general rules. That doesn't mean that it's not discretionary function. I mean, you might fire somebody who didn't use his discretionary function in a wise way. He might not like his judgment. So then you fire him from government service. That doesn't mean it wasn't. My point to refer to the OSHA cases is not necessarily to say that that makes it, it takes it out of the realm of a discretionary function. The point with the OSHA matters is that it demonstrates that these standards are not only mandatory, but they are sufficiently specific to be the basis for disciplinary action. And that is relevant ultimately to the discretionary function analysis. Now, bear in mind. You're using up all your time. I will move quickly. And let me point briefly to the report of Professor Omi. You don't want to save time for rebuttal. I would like to. Well, you have a minute and a half. I'll save less than a minute and a half for rebuttal. Professor Omi's report, particularly starting on page 1600, he goes through the fire orders and the watch-out situations and describes just how virtually all of them were violated in this situation. But our case stands not just on those, but also on the more specific instructions, rules, guidelines, and requirements down the line. Thank you. I'd like to save the remaining time. Thank you. May it please the Court. Charles Scarborough, Department of Justice for the United States. In determining how to contain or suppress forest fires, firefighters must consider a number of competing factors, including public safety, firefighter safety, available resources, weather and other conditions, costs, and potential damage to both public and private resources. And they must do that in situations where they must evaluate costs and benefits of acting versus costs and benefits of not acting. If you had a rule, though, that said never set a fire within a mile of a city, you would then not have discretion to set a mile with a fire. Then the question is these fire orders, are they mandatory, as your opponent says, and does that mean if you don't follow all these orders, then you don't have discretion? They're certainly mandatory in the sense that this is a checklist that firefighters are supposed to have out in the field. These are things that firefighters are supposed to be thinking about, but they do not divest firefighters of discretion in determining how to fight the fire. Fight fire aggressively, but provide for safety first just in and of itself shows that you are balancing. You have to balance safety. And the ultimate question, you know, they say safety first, safety first, so you couldn't do what we think you did, but safety first necessarily involves safety for whom? In this situation that Whitmer was facing, he was dealing with a huge fire that was advancing, and he was weighing safety of one group of individuals versus the safety of the people who were across the highway. I mean, I think our briefs make very clear there's safety considerations sort of all around. There's resource allocation decisions all around. This is a multiple fire situation. You had a situation. Can you say something a little more specific? Determine safety zones and escape routes. Sure. Suppose before starting the fire, the firefighting officials did not determine the safety zones and escape routes. Well, again, I think we have to distinguish between, and Your Honor alluded to this when you were responding to the OSHA point, between what might be an improper exercise of discretion that might result in an OSHA finding of violation after the fact, and the specificity necessary to divest firefighters of discretion under the discretionary function exception. Things like, you know, provide for safety routes necessarily sort of involve judgment, involve discretion about what kind of safety route is good enough. How about a more specific one here? Sure. Obtain forecasts. So what if there were forecasts available, you didn't do it, and then they said, well, you know, if you had obtained the forecast, you would have found out that, you know, we were going to have basically a hurricane coming through, but you didn't do that. And so you might have made a bad judgment on recognizing the current weather condition, but obtaining forecasts is circumscribed. Would that be a mandatory enough? Again, Your Honor, I think obtain forecasts still leaves a lot of room as to sort of how often you have to do that. What about this one? This is the one Mr. Gansfried mentioned. You know, I think it's in the WFSA or something, but that, you know, there's a mandatory requirement to maintain communication at all times, and that was not done, a violation of a mandatory duty. And that obviously, you know, added to the precariousness of the situation. Sure. I mean, again, you've got a generalized requirement that makes very good sense for firefighters out in the field to communicate with one another. That does not rise to the level of specificity that the cases dealing with the first prong of the discretionary function exception, you know, find, divest the people of discretion. You know, in Berkowitz, for instance, there were very specific directives to the government, the FDA that otherwise had discretion to approve or not the vaccine laws, but there were specific, you know, directions, run these tests, and obviously if they don't run those tests, they don't have discretion here. There is nothing comparable to, you know, what divested discretion in Berkowitz in the firefighter situation, and this Court has recognized that in Miller. I mean, sort of the main quote that gets repeated often from Miller is that, you know, there's a lot of mandatory language. There are a lot of principles that are applicable and mandatory to firefighters, but they do not eliminate discretion because they do not tell the firefighters how to fight the fire. That's the crux of this case. You can't, as Judge McKeown, you said earlier, you can't have a cookbook for fighting fires here. These are constantly changing situations in which you have to rely upon the experience of your firefighters out in the field to react to those. You cannot provide them with a cookbook. You can provide them, as the fire orders do and as the watch-out situations do, with lots of good rules, things to think about, things to mitigate, in the words of the watch-out situations. These are situations, you know, you want to make sure that when you have unburned fuel between you and the fire, you want to try to mitigate that. All of that inherently involves balancing discretionary judgment calls, and, you know, you've asked repeatedly for counsel to identify something that, you know, takes away the discretion to light the backfire on this day. You've got nothing. You've received nothing in return because there was nothing that made Whitmer not have to light the backfire operation. You want Whitmer out there making a decision that, geez, this fire is moving across and it could threaten a whole bunch of people across the highway. You want to have him with full discretion to light the backfire, and he did, in fact, have full discretion to light the backfire. I'm mindful of the Court's admonition not to use the entire amount of time, but I do want to respond just briefly to the point that we're trying to, you know, create this wildland firefighter exception. In no way are we on a blanket exception. Well, no, we don't want a blanket exception, and Your Honor made the point that Miller already, you know, goes a certain way down the line and distinguishes Ray and A, and says basically, you know, where there's discretion involved, where you don't have specific directives cabining the firefighters, you know, they don't get to have their judgments second-guessed in a tort action. All we're asking the Court to do is affirm the district court's ruling that, you know, on this day there was nothing cabining David Whitmer's discretion or any of the other firefighters that lit backfires or conducted burnout operations here. And the plaintiffs have given you nothing that cabined their discretion. So unless the Court has any further questions, I'd be happy to rest on our breaths. Thank you, counsel. Thank you, Your Honor. I think I can be very quick here. Let me respond to the contention, which is really the premise in which the government's entire argument is based, and that is that Mr. Whitmer was dealing with a huge fire advancing. The basis for the claim in the case and the allegations complaint and the contemporaneous evidence, the documentary evidence, the videotape evidence, and the expert testimony is all that the fire that Mr. Whitmer was responding to was other fires set by other government firefighters, and that those were set contrary to the same instructions, guidelines, rules, and mandatory orders that we're talking about. Dr. Omey's report is quite clear that the Spade Fire, which ostensibly is the justification for everything that Whitmer did, that there is no indication that the Spade Fire went beyond the perimeter where it existed as of the morning of August the 8th, and that the other government firefighters had not been lighting backfires. And that's what Mr. Whitmer saw, and that because they were not in communication with one another is what led to the decisions that he made without communication, without anchoring the line, without providing for safety, without being in touch with the Sula complex. I'll go on and on and on. I mean, one final point is, go back to what this Court said in the Faber case, is that there was a plan in place, there were instructions in place, they were mandatory, they were specific, and they did not give the Forest Service the option to do nothing. That's what Mr. Whitmer, Mr. Hood, who he was – who he spoke to, and Mr. Hood testified quite explicitly. He did not know where Mr. Whitmer was when Mr. Whitmer decided to start the fire. Mr. Whitmer acknowledged that if he had known that people were in there, he would not have started the fire. He was obligated, and he took no actions to determine whether people were in there. And other Forest Service employees knew that there were people in there. Some of the people out there conducting the firings knew that there were people in there. But Mr. Whitmer did not take the steps that he was required to take to find out whether people were in there. He put people at risk in a situation in which the instructions told him he could not, and he – it was in an area where he had no discretion. And I don't want to just talk about Mr. Whitmer, because we really are talking about a group of people, a number of people who made decisions during the course of the day for the six or more backfires that were started. One specific item that was – I'll mention, this is the IAP for the SULA complex, governing Mr. Whitmer, and that is, if initiating a burnout, make sure everyone knows before you begin. How much more specific does it need to be? Okay. Thank you, Kevin. Thank you. Cases here will be submitted.
judges: Reinhardt, Tashima, McKeown